UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HARRELL'S, LLC, a Florida
Limited Liability Company;
and FLORALA, LLC, a Florida
Limited Liability Company,

    Plaintiffs,

v.                            Case No.: 8:10-cv-1499-T-33AEP

AGRIUM ADVANCED (U.S.)
TECHNOLOGIES, INC.,
a Delaware Corporation,

    Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Defendant Agrium Advanced (U.S.) Technologies, Inc.'s motion to compel arbitration and to stay proceedings, filed on November 12, 2010. (Doc. # 10). On November 22, 2010, Plaintiffs Harrell's, LLC and Florala, LLC filed a response in opposition to Defendant's motion to compel. (Doc. # 16). On December 3, 2010, Agrium Advanced filed a reply memorandum. (Doc. # 22). For the reasons set forth below, the motion to compel is granted and this case will be stayed pending the alternative dispute resolution process.

**I.**   **Background**

Harrell's and Florala initiated this action for damages

1

and equitable relief against Agrium Advanced on July 6, 2010. (Doc. # 1).  Harrell's and Florala's amended complaint contains six counts.  (Doc. # 3).  Counts I-V sound in tort and Count VI is a breach of contract claim.  Specifically, they include: (1) declaratory judgment based upon direct breach of fiduciary duty of loyalty and obligation of good faith and fair dealing; (2) declaratory judgment based upon aiding and abetting and vicarious liability for breach of fiduciary duty of loyalty and obligation of good faith and fair dealing; (3) injunctive relief enjoining breach of duty; (4) equitable accounting for unlawful profits; (5) restitution by disgorgement; and (6) breach of contract.  Id.

**A.  The Parties**

Harrell's is a limited liability company organized and existing under the laws of Florida with its principal place of business in Lakeland, Florida.  Id. at 1.  Harrell's sells processed fertilizers, chemicals and seed products to customers in the "Professional Market," which include professional end users such as the golf, ornamental nursery, greenhouse and landscaping markets. (Docs. ## 3 at 2; 10-1 at 4, § 1.7).  Harrell's operates in a region the parties have defined as the "Territory," which includes all states east of Montana, Wyoming, Colorado and New Mexico. (Docs. ## 3 at 2;

10-1 at 4, § 1.11).

Agrium Advanced is a strategic business unit of Agrium Inc. (Doc. # 10 at 4). It is a multinational corporation organized and existing under the laws of the State of Delaware with its principal place of business in Loveland, Colorado. (Doc. # 3 at 1-2). It sells processed fertilizers, chemicals and seed products in agricultural and horticultural markets. Id. at 2.

Florala is a limited liability company organized and existing under the laws of Florida with its principal place of business in Lakeland, Florida. (Docs. ## 3 at 1; 10 at 5). Harrell's and Agrium Advanced are the sole members of Florala. (Docs. ## 3 at 2; 16 at 2).

On or about February 10, 2009, Harrell's and Agrium Advanced entered into an operating agreement governing the operations of Florala: the Amended and Restated Operating Agreement and Regulations of Florala, LLC, a Florida Limited Liability Company (the "Operating Agreement"). (Doc. # 3 at 2). The Operating Agreement is Florala's foundational document and references the Amended and Restated Manufacturing Agreement (the "Manufacturing Agreement") and the Amended and Restated Supply Agreement (the "Supply Agreement"), both of which were also entered into on or about February 10, 2009.

3

(Docs. ## 10 at 6; 10-4 at 9; 16 at 2). The Operating Agreement, Manufacturing Agreement and Supply Agreement became effective retroactively to January 1, 2008. (Doc. # 10 at 6).

**B.   The Complaint and the Board of Managers Meeting**

In May 2008, Agrium Inc. acquired United Agri Products, which included the acquisition of a sales force that competed with Harrell's. (Doc. # 10 at 9). In October 2009, Agrium Inc. announced that the United Agri Products sales force would become part of Agrium Advanced. Id. On July 6, 2010, Harrell's filed a six-count complaint on behalf of Harrell's and Florala against Agrium Advanced, alleging that Agrium Advanced's actions amounted to a breach of its fiduciary duty of loyalty and obligation of good faith and fair dealing and a breach of the Supply Agreement. (Doc. # 3 at 1, 13). The amended complaint asserts that Agrium Advanced breached its fiduciary duty by "selling products which compete with products sold by Harrell's in the Professional Market in the Territory." Id. at 7, 9.

On September 13, 2010, pursuant to Section 8.11 of the Operating Agreement, a special meeting of Florala's Board of Managers was convened in Lakeland, Florida, to address the claims raised in the complaint as well as Harrell's authority to file the instant lawsuit. (Docs. ## 10 at 10-11; 10-2 at

4

2). At the September 13, 2010, meeting, Florala's Board of Managers discussed and voted on nineteen resolutions. (Doc. # 10 at 11; see Doc. # 10-3). One resolution was passed and three resolutions were tabled. (Doc. # 10 at 11). The Board of Managers deadlocked with respect to the remaining resolutions. Id.

Following another round of unsuccessful discussions, Harrell's and Florala served Advanced Agrium with the amended complaint on October 21, 2010. Id. at 13. On October 29, 2010, Agrium Advanced demanded arbitration "pursuant to the terms of the Operating Agreement." Id. Harrell's and Florala responded that because "there is no arbitration clause in [the Operating Agreement] . . . we cannot agree to arbitration," but that if Agrium Advanced would instead demand "*mediation* as specified in [the Operating Agreement], Harrell's will agree to [stay the case]." (Doc. # 10-6 at 2) (emphasis in original).

Agrium Advanced filed a motion to compel arbitration on November 12, 2010, arguing that the parties' dispute is subject to a binding agreement to arbitrate that is contained within the Operating Agreement. (Doc. # 10 at 1). In response, Harrell's and Florala assert that "the scope of the narrow arbitration agreement offered by [Agrium Advanced] does

5

not embrace arbitration of the claims in this case." (Doc. # 16 at 1).  By its motion, Agrium Advanced moves to compel arbitration and to stay all proceedings in this case until the parties complete the alternative dispute resolution process. (Doc. # 10 at 1).

## II. **Legal Standard**

Under the Federal Arbitration Act (FAA), a written agreement to arbitrate in "a contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable." 9 U.S.C. § 2.  "[U]pon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, [the Court] shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.

Section 4 of the FAA provides for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement.  Thus, a district court must compel arbitration and stay the underlying action if the parties had an earlier agreement to arbitrate their dispute.  9 U.S.C. § 3; see Goodman Ltd. P'ship v. THF Constr., Inc., 321 F.3d 1094, 1095 (11th Cir. 2003) ("[A] district court must grant a motion to compel arbitration if it is satisfied that the parties actually agreed to arbitrate the

6

dispute.").

There is a strong federal policy supporting arbitration agreements. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). The purpose behind the FAA is to "ensure judicial enforcement of privately made agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219 (1985). As such, the courts must "rigorously enforce" agreements to arbitrate. Id. at 221.

"The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses, 460 U.S. at 24-25. However, "[w]hile there is a liberal federal policy favoring arbitration agreements, 'the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate.'" Becker v. Davis, 491 F.3d 1292, 1298 (11th Cir. 2007) (quoting Klay v. Pacificare Health Sys., Inc., 389 F.3d 1191, 1200 (11th Cir. 2004)). Questions of whether or not a party has agreed to arbitrate a claim are questions for the court. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995).

A federal court must undertake a two-step inquiry when considering a motion to compel arbitration. Klay, 389 F.3d at 1200 (11th Cir. 2004). First, it must determine whether the parties agreed to arbitrate. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626-28 (1985). If the Court finds that the parties agreed to arbitrate the claims, it must then determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." Id. at 628.

**III. Analysis**

    **A.    The Operating Agreement**

The Court first turns to the issue of whether the parties agreed to arbitrate. Article 15 of the Operating Agreement, entitled "Termination and Dissolution," provides the following:

> **Section 15.01 Impasse**. In the event that the Members or the Board of Managers reach an "Impasse" (as defined in Section 15.03 below) with respect to the operations of the Company, either Member shall be entitled to demand mediation in accordance with the procedures set forth below. The purpose of such mediation shall be to make a binding determination as to whether the matter in controversy constitutes an Impasse in order to work to resolve such controversy.

(Doc. # 10-4 at 21, § 15.01).

Section 15.03 defines "Impasse" and outlines an

8

arbitration and mediation process aimed at its resolution:

> **Section 15.03 Impasse Resolution.** In the event that the Members reach a deadlock with respect to the operations of the Company which remains unresolved for a period of more than thirty (30) days (an "<u>Impasse</u>") and which is not a Non-Impasse Item, then either Member may request mediation to determine whether such controversy constitutes a good faith Impasse. The mediation will be conducted in Atlanta, Georgia . . . by a panel of three (3) certified mediators, one of which shall be appointed by each Member and the third shall be appointed by the two mediators appointed by the respective Members. Each mediator shall be certified and experienced in financial, accounting and general business matters. The appointment of the mediators, their qualifications and the procedures described herein shall be governed by the applicable provisions of the Georgia Supreme Court's Alternative Dispute Resolution Rules . . . ("the <u>Rules</u>") . . . . Notwithstanding contrary provisions contained in the Rules, the mediators will make a binding determination as to whether the matter in controversy constitutes an Impasse raised in good faith and does not constitute a Non-Impasse Item. The Members agree to be bound by the decision of the mediator with respect thereto, it being the intent of the Members that neither Member be allowed to trigger a dissolution of the Company through unreasonably creating an Impasse for their individual gain. If the mediator determines that an Impasse has been raised in good faith, then the Members will participate in non-binding mediation pursuant to the applicable provisions of the Rules in an attempt to resolve such dispute. If the dispute has not been resolved after thirty (30) full days of mediation, then either Member may demand the Termination of the Company, whereupon the Company shall be liquidated and dissolved in accordance with the terms of this Agreement and the LLC Act.

(Doc. # 10-4 at 22, § 15.03).[1]

The Court notes, as a threshold matter, that the use of the word "mediation," rather than "arbitration," in Sections 15.01 and 15.03 does not bar invocation of the FAA. In <u>Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.</u>, the Eleventh Circuit explained:

> Normally labels do not control; indeed, if an agreement specifies in detail a dispute resolution procedure which it calls "mediation" (or anything else) but which is, in substance, FAA "arbitration," substance controls over title.

524 F.3d 1235, 1240 n.4 (11th Cir. 2008).

To determine whether any particular dispute resolution method chosen in a contract is FAA arbitration, the Court looks for the "common incidents" of "classic arbitration," including the presence of an independent adjudicator who applies substantive legal standards, considers evidence and argument, either formally or informally, and renders a

---

[1] The Court notes that Section 15.02 excludes a specified class of disagreements from constituting an "Impasse." (<u>See</u> Doc. # 10-4 at 21-22, § 15.02). Section 15.02 does not affect the Court's analysis because Section 15.03 expressly delegates the task of "mak[ing] a binding determination as to whether the matter in controversy . . . does not constitute a Non-Impasse Item" to the arbitrators. (Doc. # 10-4 at 22, § 15.03); <u>see</u> <u>First Options of Chicago, Inc.</u>, 514 U.S. at 943 ("[T]he question [of] who has the primary power to decide arbitrability turns upon what the parties agreed about *that* matter.") (internal citations omitted).

decision that purports to resolve the rights and duties of the parties. Id. at 1239.

In Advanced Bodycare, the Eleventh Circuit explained the difference between arbitration and mediation:

> Mediation, as that term is commonly understood, is a method of nonbinding dispute resolution involving a neutral third party who tries to help the disputing parties reach a mutually agreeable solution, or a process in which a mediator facilitates communication and negotiation between parties to assist them in reaching a voluntary agreement regarding their dispute. Simply stated, mediation does not resolve a dispute, it merely helps the parties do so. In contrast, the FAA presumes that the arbitration process itself will produce a resolution independent of the parties' acquiescence-an award which declares the parties' rights and which may be confirmed with the force of a judgment.

Id. at 1240 (internal citations omitted).

Here, Section 15.03 prescribes a two-phase resolution mechanism for impasses consisting of arbitration in the first instance followed by mediation. The initial phase, in which a panel of three certified third parties evaluate the nature of an "'Impasse' . . . with respect to the operations of the Company," contains the decisive hallmarks of arbitration. (Doc. # 10-4 at 21, § 15.01). It calls for the appointment of three certified adjudicators who are appointed in accordance with, and bound by, the Alternative Dispute Resolution Rules of the Georgia Supreme Court, who possess experience in

11

"financial, accounting and general business matters," and who will make "binding" determinations regarding the nature of the impasses. Id. at § 15.03. The latter phase, in which the parties "attempt to resolve such dispute[s]," calls for "non-binding mediation", which this Court recognizes as mediation as explained by the Eleventh Circuit. Id.

Further, the Alternative Dispute Resolution Rules of the Georgia Supreme Court (Doc. # 10-7), which the parties chose as governing the impasse resolution process, are in harmony with Eleventh Circuit jurisprudence. Mediation is "a process in which a neutral facilitates settlement discussions between parties" and the neutral "has no authority to make a decision or impose a settlement on the parties." (Doc. # 10-7 at 2). In contrast, arbitration is a "form of adjudication" in which "an arbitrator or panel of arbitrators renders a decision." Id.

Agrium Advanced contends that the parties' dispute is subject to the arbitration provision in the Operating Agreement. (Doc. # 10 at 1.) Harrell's and Florala argue that "[t]he scope of the narrow arbitration agreement" excludes the claims in this case. (Doc. # 16 at 1).[2] They

---

[2] Implicit in this argument is Harrell's and Florala's agreement that the Operating Agreement contains an agreement

contend that the "narrow language of Article 15 confining the neutrals' function to finding an impasse and assisting in its negotiation should not be expanded to a general arbitration clause of 'all disputes' without some textual evidence that this was the parties' intent." Id. at 9.

Indeed, "courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1057 (11th Cir. 1998) (quoting Goldberg v. Bear, Stearns & Co., 912 F.2d 1418, 1419-20 (11th Cir. 1990)). Harrell's and Florala's suggestion that such a "twist" would be necessary to compel arbitration, however, is misguided.

In determining whether a claim falls within the reach of the parties' arbitration agreement, a court will examine the factual allegations of the complaint rather then the "legal labels" of the causes of action asserted. Gregory v. Electro-Mechanical Corp., 83 F.3d 382, 384 (11th Cir. 1996).

   B.   **Counts I and II**

In Counts I and II, Harrell's and Florala advance alternative theories for Agrium Advanced's alleged breach of

---

to arbitrate.

its fiduciary duty of loyalty and obligation of good faith and fair dealing pursuant to Sections 608.4225 and 607.0831 of the Florida Statutes. (Doc. # 3 at 6, 9). They allege that Agrium Advanced breached its fiduciary duty by "selling products which compete with products sold by Harrell's in the Professional Market in the Territory." Id. at 7, 9.

The amended complaint asserts that Agrium Advanced is not permitted to compete with Harrell's, either directly or indirectly, in the Professional Market in the Territory, and that Agrium Advanced is legally prohibited from taking any legal action to remedy Agrium Advanced's alleged breaches, including the filing of this action. Id. at 8, 10. Agrium Advanced, on the other hand, maintains that it is not legally precluded from competing directly or indirectly with Harrell's or Florala.

Counts I and II presuppose that Agrium Advanced's actions constitute "impermissible direct competition," which is a point of dispute between the parties. The transcript of the September 13, 2010, meeting reveals that the Board of Managers deadlocked on this issue. (See Doc. # 10-3 at 19-20, 22-28, 34-35). Because a deadlock "with respect to the operations of the Company" triggers Section 15.03, the Court determines that Counts I and II are subject to the arbitration and mediation

14

process.

Harrell's and Florala suggest that Counts I and II should be excluded from the procedures set forth in Section 15.03 on the basis that they "do not seek money damages [or injunctive relief], but rather a judicial declaration of whether, on two alternative theories, [Agrium Advanced] is liable for breach of the duty of loyalty to Florala and/or Harrell's." (Doc. # 16 at 18).

The Court is not persuaded by this argument. The critical factor is not, as Harrell's and Florala suggest, the form of relief sought; rather, it is whether the claims in this case are encompassed within the scope of Section 15.03. Counts I and II are inextricably intertwined with whether or not Agrium Advanced has engaged in "impermissible direct competition," which Harrell's and Florala, in their amended complaint, expressly acknowledge as a source of contention between the parties. Accordingly, the prescribed arbitration and mediation process is appropriate.

### C.   Counts III, IV and V

Harrell's and Florala's requests in Count III, IV and V are similarly premised on the allegations of "impermissible direct competition" by Agrium Advanced. (Doc. # 3 at 11-13). Count III seeks injunctive relief restraining "direct or

15

indirect competition with Florala or Harrell's." Id. at 11-12. Count IV requests the equitable accounting for unlawful profits. Id. at 12. Count V seeks restitution by disgorgement of all unlawful profits. Id. at 13. Because these claims, like Counts I and II, are steeped in the substance of the disputes engendering deadlock at the meeting held on September 13, 2010, the Court determines that they are subject to Section 15.03's arbitration and mediation requirement.[3]

### D. Count VI

Count VI is a breach of contract claim based on Section 2.1.2 of the Supply Agreement.[4] Id. at 13; see Doc. # 10-1 at

---

[3] Harrell's and Florala suggest that Section 15.03 may be evaluated by considering whether the dispute was reasonably foreseeable to the parties when they entered into the Operating Agreement. See Hemispherx Biopharma, Inc. v. Johannesburg Consolidated Investments, 553 F.3d 1351, 1366-67 (11th Cir. 2008). Harrell's and Florala argue that the "arbitration of claims for . . . tortious breach of loyalty by direct competition with Florala [cannot] be deemed 'reasonably foreseeable'" because Section 15.02 of the Operating Agreement excludes a specific class of disagreements from being an "Impasse Item" pursuant to Section 15.03. (Doc. # 16 at 9; see Doc. # 10-4 at 21-22, § 15.02). The Court rejects this argument because, as explained in Footnote 1, Section 15.03 specifically designates that it is the arbitrators who "will make a binding determination as to whether the matter in controversy . . . does not constitute a Non-Impasse Item." (Doc. # 10-4 at 22, § 15.03).

[4] Harrell's and Florala urge the Court to adopt a "collateral agreement" analysis to determine whether the scope

16

5, § 2.1.2. Harrell's and Florala allege that Agrium Advanced has, since on or about January 1, 2008, "sold SCU [a chemical fertilizer] in the Professional Market in the Territory to customers other than national customers and has not paid the sums to Harrell's . . . [as] required by the terms of ¶ 2.1.2 of the Supply Agreement."[5]  (Doc. # 3 at 14).  Section 2.1.2 provides, in relevant part:

> In the event Supplier sells any Polyon Products or SCU Products in the Professional Market in the Territory (other than to a national customer), Supplier shall pay to Harrell's for the benefit of the Company the profits Supplier would have received on all such sales equal to the difference between the net invoice price for such coated product received by Supplier on such sale less the Purchase Price which Harrell's would have paid for the benefit of the Company for such Product hereunder.

(Doc. # 10-1 at 5, § 2.1.2).[6]

Harrell's and Florala argue that Count VI is not subject to arbitration and should be permitted to proceed to litigation.  Harrell's and Florala contend that Count VI has

---

of Section 15.03 encompasses Count VI. (Doc. # 16 at 10; see Fleet Tire Serv. v. Oliver Rubber, 118 F.3d 619, 621 (8th Cir. 1997)).  The Court declines to do so.  This approach, which has not been adopted by the Eleventh Circuit, is utilized in the context of collective bargaining agreements.

[5] SCU is a chemical fertilizer manufactured by Agrium Advanced.  (Doc. #10 at 5 n.2; Doc. # 10-1 at 4, ¶ 1.9).

[6] Polyon Products are Harrell's and Florala's primary product line.  (Doc. # 3 at 3).

17

no "connection . . . with [the Operating Agreement's] ADR provision." (Doc. # 16 at 19). The Court disagrees. Although a separate document, the Supply Agreement was entered into on the same day as the Operating Agreement and is amply referenced in the Operating Agreement, Florala's foundational document. (See Doc. # 10-4 at 3; at 6, § 2.01(jj); at 9, § 6.01; at 21-22, § 15.02). Moreover, the transcript of the September 13, 2010, meeting shows that the Board of Managers deadlocked regarding issues impacting the breach of contract claim in Count VI. (See Doc. # 10-3 at 26-27, 59-60, 68-69, 71-72). As such, Count VI falls within the ambit of Section 15.03's arbitration and mediation procedure.

### E. Other Provisions

Finally, Harrell's and Florala imply that other provisions in the Operating Agreement require denial of the motion to compel arbitration. The Court has reviewed the provisions cited (contained in Articles 6 and 8 of the Operating Agreement) and determines that they do not bar arbitration. "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25. None of the contract provisions referenced by Harrell's and Florala bar the disputes in this case from

18

activating the arbitration and mediation procedures set forth in Section 15.03.

After a careful review of the record and the arguments presented, the Court determines that the arbitration and mediation procedures prescribed in Section 15.03 encompass all of the claims of this case. Finding no legal constraints to foreclose arbitration, the Court concludes that arbitration is now appropriate, and this case will be stayed pending the completion of the alternative dispute resolution process.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant's motion to compel arbitration and to stay proceedings (Doc. # 10) is **GRANTED.**

(2) This case is **STAYED** and **ADMINISTRATIVELY CLOSED** pending the completion of the alternative dispute resolution process.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 11th day of June, 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record